IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

UNITED STATES ex rel.
OREN LAMBERT, et al.,

    Plaintiffs,

v.                            CIVIL ACTION NO. 1:13-1106

ELLIOTT CONTRACTING, INC.,
et al.,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

    This matter is before the court on defendants' motions to dismiss relators' amended complaint pursuant to Federal Rule of Civil Procedure 9(b).  (Doc. Nos. 38, 42).  For the reasons that follow, the court **GRANTS** in part and **DENIES** in part defendants' motions to dismiss.

**I.    Background**[1]

    The instant dispute centers on the construction of a federal prison in McDowell County, West Virginia.  Defendant Clark Construction Group, LLC (hereinafter "Clark") acted as the general contractor for the construction of Federal Corrections Institute McDowell ("FCI McDowell").  (Doc. No. 34 at ¶ 13).

---

[1] For purposes of these motions, the court assumes all of relators' well-pleaded allegations to be true, and views all facts in the light most favorable to relators.  T.G. Slater v. Donald P. & Patricia A. Brennan, LLC, 385 F.3d 836, 841 (4th Cir. 2004) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)); see Fed. R. Civ. P. 12(b)(6).

Defendant Elliott Contracting, Inc. (hereinafter "Elliott")
acted as a subcontractor for Clark, handling plumbing and HVAC
installation services during the prison's construction. (Doc.
No. 34 at ¶ 14). Relators Oren Lambert, James Day, Jonathan
Miller, Michael Spencer, and Lance Lambert all worked for
defendant Elliott in various capacities.

### A. The Contract

On May 26, 2006, the Federal Bureau of Prisons ("BOP")
awarded the FCI McDowell construction contract to Clark,
Contract No. DJB-X00-039 (hereinafter "the contract"). (Doc.
No. 34 at ¶ 13). The contract provided for over $232 million in
payments to Clark during construction of the facility. Id.
Like many other federal construction contracts, the contract
required Clark and all subcontractors to comply with the Buy
American Act and the Federal Trade Agreements Act. (Doc. No. 34
at ¶ 18). Pursuant to these federal laws, all materials used in
the construction of FCI McDowell had to originate in the United
States or one of a number of Designated Countries.[2] Notably, the
Designated Countries list does not include the People's Republic
of China or Vietnam and, as a result, materials from either
country may not be used in the construction of a federal
building or public work.

---

[2] The full list of Designated Countries appears at 48 C.F.R.
25.003 (2013).

Further, the contract mandated that Clark and all subcontractors comply with the Davis–Bacon Act. (Doc. No. 34 at ¶ 21). This required both Clark and all subcontractors to pay their workers the prevailing wage for his or her craft--a wage rate determined by the Department of Labor. Id. For the construction of FCI McDowell, the contract specified a prevailing wage of $27.34 per hour for a general laborer and $40.64 for a plumber (a base pay rate of $27.51 per hour plus $13.13 in fringe benefits). (Doc. No. 34 at ¶¶ 33–4). The contract further required each subcontractor to submit weekly payroll reports to Clark at the end of each work week, with Clark then to submit the subcontractors' reports to the Government along with their own weekly payroll reports. (Doc. No. 34 at ¶ 25). These reports also included a certification that all workers received their full wages, without any deductions or rebates. (Doc. No. 34 at ¶ 26).

### B. Relators' Claims

#### 1. Use of Plumbing Parts from Non-Designated Countries

Relators' first claim alleges violations of the Buy American Act and Trade Agreements Act. Defendant Elliott hired Relator Michael Spencer in September 2007 as an Operating Engineer IV on the project. (Doc. No. 34 at ¶ 37). Soon thereafter, Elliott Project Manager Eddie McCoy gave Spencer

3

another job:  to obscure the origin of plumbing parts from non-Designated Countries.  (Doc. No. 34 at ¶ 38).  McCoy directed Spencer to remove country of origin markings from plumbing parts that Elliott employees later installed in the prison.  (Doc. No. 34 at ¶¶ 38, 41).  McCoy told Spencer that this was part of Spencer's job and that Spencer would lose his position unless he obeyed.  (Doc. No. 34 at ¶ 38).

Spencer complied with McCoy's direction and used a grinding machine to remove country of origin stamps from plumbing parts, usually "Made in China" or "Made in Vietnam" stamps.  Id.  Once he removed the markings, Spencer then painted over the plumbing parts to obscure further their origin.  (Doc. No. 34 at ¶ 40). Spencer estimates that he did this for "dozens of pallets, with each pallet holding numerous boxes, and each box dozens of parts."  (Doc. No. 34 at ¶ 38).

Further, Spencer alleges that Elliott took considerable steps to conceal his work.  When federal officials inspected the construction site, McCoy or another Elliott employee locked Spencer in a storage unit to hide the grinding operation.  (Doc. No. 34 at ¶ 39).  When he wanted to be let out, Spencer had to bang on the walls of the storage unit.  Id.

When Clark employees inspected Elliott's work, they discovered Elliott's use of plumbing parts originating from non-Designated Countries.  (Doc. No. 34 at ¶ 43).  After the

4

discovery, Clark inspectors directed Elliott to remove those non-compliant plumbing parts that Elliott had already installed. Id. But after this initial inspection, Clark did not check Elliott's work again to determine whether Elliott followed through with this directive or discontinued its use of plumbing parts from China and Vietnam.   Id.

### 2. Misclassification of Relators' Work and Unpaid Overtime

Relators' second claim alleges violations of the Davis-Bacon Act.  Relators Oren Lambert, Jonathan Miller, Lance Lambert, and James Day contend that they worked as plumbers on the FCI McDowell project.  (Doc. No. 34 at ¶¶ 55–68).  While they acknowledge that they each performed some work on the project that was unrelated to plumbing, they all contend that this non-plumbing work was de minimis.  Id.  However, Elliott paid each relator at an hourly rate (absent overtime or holiday pay) of $27.34, the rate for a general laborer, rather than the $40.64 hourly rate set for plumbers.  Id.  Each relator contends that he did not receive any fringe benefits along with his hourly wage.  Id.

Further, relators allege geographic discrimination by Elliott.  Employees who hailed from Kentucky worked as general laborers, but received plumbers' wages, while those workers, relators included, who were from West Virginia received only

5

general laborers' wages despite working as plumbers. (Doc. No. 34 at ¶ 73). Again, relators implicate Elliott Project Manager Eddie McCoy and contend that he as well as Elliott's managing executives knew of the labor misclassification, but did nothing to correct it. (Doc. No. 34 at ¶ 74).

According to relators, Clark knew of the misclassification, as well. (Doc. No. 34 at ¶ 75). In or around October 2007, Clark employees acknowledged that relators and others were doing plumbing work, but receiving only general laborers' wages. Id. Clark employees Kenny Keefer and Jack Donithan told Clark Project Manager Dave Young about the misclassification, but Young told the two to drop the issue and not raise it again. Id.

Relators also allege unpaid overtime in connection with their responsibilities at FCI McDowell. (Doc. No. 34 at ¶ 81). Elliott required each project worker, including relators, to work sixteen hours on several weekends. Id. During this time, relators and other Elliott employees worked on the construction of the residence of Claude Sullivan, an Elliott Supervisor. Id. Elliott did not pay relators for their work; instead, Elliott supervisors considered the work to be a condition of employment on the FCI McDowell project. Id.

6

### 3. Employment of Illegal Aliens

Finally, relators contend that Elliott hired undocumented workers from Mexico and countries in Central America to work as project workers on the FCI McDowell project. (Doc. No. 34 at ¶ 45).  According to relators, an Elliott foreman, Juan Perez, recruited these undocumented workers, two of whom went by the names "Ricardo" and "Maynor."  (Doc. No. 34 at ¶ 45-6).  In return for getting the job, Perez demanded a $100 up-front payment from each undocumented worker.  (Doc. No. 34 at ¶ 47). Perez kept some of the money for himself; the rest went to his supervisors at Elliott, who were aware of the kickback scheme. (Doc. No. 34 at ¶ 48).

At the end of each week, Elliott required all undocumented workers to hand over their paychecks to be cashed.  (Doc. No. 34 at ¶ 50).  An Elliott employee then took the paychecks, usually 25 to 30 checks, to a local grocery store for cashing.  Id.  The Elliott employee reserved $100 from each paycheck, $150 if the worker received overtime pay, and then distributed the remainder of the paycheck to the worker.  Id.

Relators implicate Clark in the kickback scheme, as well. According to relators, Clark purported to perform a background check for every individual who worked on the FCI McDowell project.  (Doc. No. 34 at ¶ 53).  However, Clark did not perform background checks on these undocumented workers.  Id.

7

## II.  **Procedural History**

On January 22, 2013, relators filed a qui tam complaint under seal against defendants Clark and Elliott.  (Doc. No. 1). The United States declined to intervene and the case was unsealed on November 26, 2013.  (Doc. Nos. 10, 11).  On May 2, 2014, Clark filed a motion to dismiss relators' complaint. (Doc. No. 27).  On May 16, 2014, Elliott also filed a motion to dismiss.  (Doc. No. 31).

On May 23, 2014, relators filed an amended complaint. (Doc. No. 34).  In the amended complaint, relators allege a single count related to violations of the False Claims Act ("FCA").  In this count, relators allege that defendants violated the FCA in a number of ways:  (1) illegally employing illegal aliens in violation of 8 U.S.C. § 1324(a)(3)(a) and Executive Order 12989; (2) violating the Buy American and Trade Agreements Acts and thereby knowingly certifying false claims for payment to the Government; (3) violating the Davis-Bacon Act by failing to pay workers the prevailing wage and thereby knowingly presenting and certifying false claims; (4) violating the Copeland and Davis-Bacon Acts by extorting kickbacks from undocumented workers and thereby knowingly presenting and certifying false claims for payment; and (5) conspiring to violate the FCA.

On June 9, 2014, Clark filed a motion to dismiss the amended complaint, (Doc. No. 38), and Elliott filed a motion to dismiss the amended complaint on June 25, 2014.  (Doc. No. 42). The motions are now ripe for review.

### III. **Legal Standard**

Fundamentally, a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests whether a plaintiff's complaint satisfies Rule 8(a)'s liberal pleading requirements.  Rule 8(a) of the Federal Rules of Civil Procedure requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (2014).  In deciding a motion to dismiss, the court may consider the complaint, its attachments, and documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic."  Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

Further, to survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations

must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In the instant case, the heightened pleading standards of Rule 9 apply to relators' complaint because relators allege fraud pursuant to the False Claims Act.  The Federal Rules of Civil Procedure express a degree of skepticism toward claims of fraud.  Under Rule 9(b), "special matters" such as fraud must be "stated with particularity."  "[T]he circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Wright & Miller, Federal Practice & Procedure § 1297 at 590 (2d ed. 1990)). Moreover, where plaintiffs ask multiple defendants to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).  Complaints that fail to meet these heightened pleading requirements are subject to dismissal. Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 980 (4th Cir. 1990).

**IV.   Analysis**

**A. False Claims Act**

Relators allege that defendants violated the False Claims Act under three theories:  (1) presentation of false claims under 31 U.S.C. § 3729(a)(1)(A); (2) making or using a false record or statement to cause a claim to be paid (commonly referred to as a "false certification claim") under 31 U.S.C. § 3729(a)(1)(B); and (3) conspiracy under 31 U.S.C. § 3729(a)(1)(C).  "The test for False Claims liability . . . is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')."  Harrison, 176 F.3d at 778.

**B. False Certification Resulting from Violations of the Buy American and Trade Agreements Acts**

Relators claim that defendant Elliott violated the Buy American and Trade Agreements Acts by knowingly using plumbing parts from non-Designated Countries and falsely certifying that they did not use such parts, thereby violating the False Claims Act.  Generally, false certification arises where (1) "a Government contract or program required compliance with certain conditions as a prerequisite to a Government benefit, payment or program;" (2) "the defendant failed to comply with those

11

conditions;" and (3) "the defendant falsely certified that it had complied with the conditions in order to induce the Government benefit." <u>United States ex rel. Godfrey v. KBR, Inc.</u>, 360 F. App'x 407, 411–12 (4th Cir. 2010).

These requirements must also be met in light of Rule 9(b)'s heightened pleading standard for fraud. <u>Harrison</u>, 176 F.3d at 784. To satisfy Rule 9(b), the party who asserts fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 379 (4th Cir. 2008) (citation and internal quotation marks omitted). One court has described this standard as "the first paragraph of any newspaper story": the who, what, when where, and how. <u>United States ex rel. Lusby v. Rolls-Royce Corp.</u>, 570 F.3d 849, 853 (7th Cir. 2009).

In this case, defendants argue that relators' amended complaint fails Rule 9(b)'s particularity standard because the amended complaint does not contain sufficient factual information regarding relators' claim that defendants violated the Buy American and Trade Agreements Acts. Specifically, defendants argue that Rule 9(b) requires relators to plead <u>which</u> plumbing parts were fraudulently installed, where they were installed, and when they were incorporated into the project.

12

Alternatively, relators argue that they have satisfied Rule 9(b)'s particularity requirements by pleading that defendant Elliott installed plumbing parts from China and Vietnam in FCI McDowell, while Clark turned a blind eye.

### 1. Particularity of "Plumbing Parts"

The court first addresses whether the amended complaint satisfies Rule 9(b) regarding relators' claim that Elliott installed non-compliant plumbing parts in FCI McDowell. The most instructive case on this issue comes from the United States Court of Appeals for the Seventh Circuit. In United States ex rel. Lusby v. Rolls-Royce Corporation, the relator, Curtis Lusby, worked as an engineer for Rolls-Royce from 1992 through 2001. 570 F.3d at 850. Lusby worked on airplane engines the company developed for the Government--specifically, the T56 turboprop engine. Id. Believing that Rolls-Royce was constructing the engines improperly and falsely certifying to the United States that the engines conformed to contract specifications, Lusby filed a qui tam suit. Id. at 850–51.

In his complaint, Lusby alleged that Rolls-Royce defrauded the Government regarding the quality of the T56 engine. Id. at 853. But Lusby's complaint did not stop there--he alleged fraud with specificity. Id. Lusby claimed that the root of the engines' problems could be traced to the turbine blades in the T56, explicitly identifying the parts of the engine that caused

13

the problems, naming "specific parts shipped on specific dates."
Id.  The Seventh Circuit found that a complaint that alleged
fraud with such specificity met the Rule 9(b) standard because
Lusby's accusations were "not vague.  Rolls-Royce has been told
exactly what the fraud entails."  Id. at 855.

The court finds that relators' amended complaint does not
satisfy Rule 9(b) because it does not allege fraudulent conduct
with necessary specificity.  Relators consistently tout their
status as "insiders" who worked as plumbers on the FCI McDowell
project.  With such inside information, relators should be able
to allege violations of the Buy American and Trade Agreements
Acts with more specificity than merely to cite non-compliant
"plumbing parts."  Relators allege that one of their number,
Michael Spencer, himself removed the country of origin stamps
from plumbing parts.  If so, then he should be able to enumerate
the types of plumbing parts from which he removed the country of
origin stamps.

As it stands, relators' amended complaint does not allow
defendants to respond adequately to the allegations.  There are
many rationales behind Rule 9(b), including "providing notice to
a defendant of its alleged misconduct, . . . [and] eliminating
fraud actions in which all the facts are learned after
discovery."  United States ex rel. Nathan v. Takeda Pharm. N.
Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013) (quoting Harrison,

14

176 F.3d at 784) (internal citations and quotation marks omitted).  Relators' amended complaint alleges that Elliott used improper plumbing parts, but fails to give defendants a sufficient starting point to investigate relators' claims. Where should defendants look to find the non-compliant plumbing parts?  Did the water faucets in the cafeteria originate from China?  Or the shower drains? Or bathroom sinks?  Or water fountains?  FCI McDowell is considerably larger than an airplane engine and relators need to point defendants in the right direction, or else both parties could spend considerable time on a fishing expedition, which is precisely what Rule 9(b) seeks to eliminate.  Consequently, relators' claim regarding false certification related to violations of the Buy American and Trade Agreements Act is dismissed.

### 2. Clark's Failure to Ensure Elliott's Compliance with the Buy American and Trade Agreements Act

Relators also contend that defendant Clark deliberately turned a blind eye to Elliott's use of non-compliant parts, but this too fails the particularity standard of Rule 9(b). Relators allege that Clark inspectors discovered Elliott's use of Chinese and Vietnamese parts and ordered Elliott to replace the non-compliant parts.  Thereafter, Clark "discontinued" its inspections for the remainder of the project, "deliberately

15

turning a blind eye to Elliott's use of the parts from China, Vietnam, and other non-Designated Countries."

These allegations fail the newspaper lead test because the amended complaint fails to provide the who, the what, the when, the where, and the how as required by Rule 9(b).  The amended complaint does not identify which Clark representative "discontinued" inspections, when he or she chose to do so, or that the inspections were even a regular occurrence.  Relators have not indicated that Clark treated Elliott differently from any other subcontractor or that a decision to discontinue inspections arose out of Elliott's use of parts from non-Designated Countries.  Without such supporting facts, relators are unable to nudge their amended complaint from conceivable to plausible.  As a result, the court dismisses relators' false certification claim against defendant Clark related to violations of the Buy American and Trade Agreements Acts for this reason, as well.

### C. Presentation of False Claims in Violation of the Davis-Bacon Act

Relators claim that defendant Elliott intentionally misclassified their work in violation of the Davis-Bacon Act, falsely certified that all workers received the appropriate wage, and presented these claims for payment to the Government in their weekly payroll reports.  As defendant Clark signed off

on these reports, relators claim that this action violated the Davis–Bacon Act and, as a result, Clark also presented and certified false claims to the Government.

In their motions to dismiss, defendants claim that this court does not have jurisdiction over relators' misclassification claim. Instead, defendants assert that the Department of Labor has primary jurisdiction over relators' misclassification claim. For their part, relators contend that this court, and not the Department of Labor, has jurisdiction.

## 1. The Davis–Bacon Act

The terms of the FCI McDowell construction contract required Clark and all subcontractors, including Elliott, to comply with the Davis–Bacon Act, 40 U.S.C. § 3141 et seq. The Davis–Bacon Act dates back to the Great Depression, when Congress sought to ensure that contractors who bid on federal contracts could not submit bids based on below-market labor costs and thereby drive down local wages. See United States ex rel. Krol v. Arch Ins. Co., 2014 WL 4548610, No. 13-cv-449 (RJS), (S.D.N.Y. Sept. 11, 2014) (citing Carrion v. Agfa Const., Inc., 720 F.3d 382, 384 n.4 (2d Cir. 2013); Univs. Research Ass'n, Inc. v. Coutu, 450 U.S. 754, 773 (1981)). The Act "requires certain federal Government contracts for construction, alteration and/or repair . . . of public buildings or public works of the United States to contain a provision stating the

17

minimum wages to be paid various classes of laborers and mechanics." United States ex rel. Windsor v. DynCorp, Inc., 895 F. Supp. 844, 848 (E.D. Va. 1994) (internal citations omitted); see also 29 C.F.R. § 5.5(a)(1)(i) (2014).  The contracting Government agency determines the minimum wages for each classification of laborers necessary for completion of the contracted work.  Id. at 849.  This wage determination must be based upon the Secretary of Labor's wage rates and "[t]he correctness of the Secretary's wage rate determination is not subject to judicial review."  Id. (quoting Univs. Research Ass'n, 450 U.S. at 760).

Further, compliance with the Davis-Bacon Act required Clark and all subcontractors to maintain payroll records listing "the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid . . ., daily and weekly number of hours worked, deductions made and actual wages paid."  29 C.F.R. § 5.5(a)(3)(i).  Both Clark and its subcontractors were required to submit the records on a weekly basis, as well as certifying the payroll information's accuracy and that workers were not paid "less than the applicable wage rates . . . for the classification of work performed."  29 C.F.R. § 5.5(a)(3)(ii)(B).  False certification can lead to liability under the False Claims Act.  29 C.F.R. § 5.5(a)(3)(ii)(D).

### 2. Primary Jurisdiction

The doctrine of primary jurisdiction allows a district court to refer a determinative issue to an administrative agency when the issue is "within the special competence of [that] administrative agency."  In re Bulldog Trucking, Inc., 66 F.3d 1390, 1399-1400 (4th Cir. 1995) (quoting Reiter v. Cooper, 507 U.S. 258, 268-69 (1993)).  Where an issue involves "technical and intricate questions of fact and policy that Congress has assigned to a specific agency," referral is often appropriate. N.Y. State Elec. & Gas Corp. v. N.Y. Indep. Sys. Operator, Inc., 168 F. Supp. 2d 23, 26 (N.D.N.Y. 2001); see also Moore v. Equitrans, L.P., 2014 WL 4802039, Civil Action No. 1:12CV123, at *17 (N.D.W. Va. Sept. 23, 2014).

In support of their argument that this court should refer the dispute to the Department of Labor, defendants rely on United States ex rel. Windsor v. DynCorp, Inc., and the facts of Windsor closely parallel those here.  In Windsor, the relator claimed that DynCorp intentionally misclassified and, as a result, underpaid certain workers, classifying them as "Laborers," rather than "Electricians" or "Carpenters."  895 F. Supp. at 849-50.  However, the court concluded that the Department of Labor should determine whether the defendant misclassified the relator because "the responsibility for resolving such disputes rests not with the courts, but with the

19

Department of Labor." Id. at 851. "Under labor regulations, the contracting agency is responsible for investigating a contractor's compliance with the Davis-Bacon Act by performing confidential interviews with employees and examining payroll data." Id. (citing 29 C.F.R. § 5.6(a)(3)). In this case, relators make a similar claim, arguing that Elliott intentionally misclassified them as general laborers, rather than plumbers, and, thereby, underpaid them. Using Windsor as a guide, defendants argue that this court does not have jurisdiction over relators' claims and, as a result, relators' misclassification claims must be dismissed.

Conversely, relators argue that the court should not refer the case to the Department of Labor, relying on United States ex rel. Wall v. Circle C Construction, 697 F.3d 345 (6th Cir. 2012), and United States ex rel. International Brotherhood of Electrical Workers v. The Farfield Co., 2013 WL 3327505, Civil Action No. 09-4230 (E.D. Pa. July 2, 2013). Both cases discuss the Windsor decision and each concludes that the facts in their respective cases were distinguishable from Windsor. 697 F.3d at 354; 2013 WL 3327505, Civil Action No. 09-4230, at *6-7. As a result, both courts declined referral to the Department of Labor. Id.; 2013 WL 3327505, Civil Action No. 09-4230, at *7.

Having reviewed these decisions, the court concludes that Windsor provides a better model for this case than Wall or

20

_Farfield_.  Notably, the _Wall_ relators made a different claim
than relators in this case.  _Wall_ concerned only false
certification, not misclassification.  697 F.3d at 354.  In
fact, the defendant construction company's documents
demonstrated affirmatively that it paid their laborers below
required rates:  the company compensated its electricians at $12
to $16 per hour when the contract required a minimum wage for
electricians of $19.19 per hour, plus $3.94 in hourly fringe
benefits.  _Id._ at 348.  In this case, relators acknowledge that
they were paid the appropriate rate for general laborers, but
contend that they were plumbers, not general laborers.  This
distinction makes their claim a classification dispute, rather
than merely a false certification dispute.

Additionally, a critical fact in _Farfield_ distinguishes it
from the instant case.  In _Farfield_, the Department of Labor
already had investigated Farfield's practices and determined
that the company paid some of its employees the incorrect wage
rate.  2013 WL 3327505, Civil Action No. 09-4230, at *1.  The
district court had no need to refer the case back to the
Department of Labor because it already had the benefit of the
agency's determination.  In this case, relators do not allege
that the Department of Labor has investigated their claims of
misclassification and the court does not have the benefit of a
prior agency determination regarding relators' claims.

21

Furthermore, after reviewing the case law on misclassification and primary jurisdiction, the court finds the regulation dispositive. As noted in Windsor, the language of the regulation denotes mandatory, rather than permissive action. Under the regulation, disputes related to labor standards shall be resolved in accordance with the procedures of the Department of Labor. 29 C.F.R. § 5.5(a)(9) (emphasis added); see also Univs. Research Ass'n, 450 U.S. at 761 ("Disputes over the proper classification of workers under a contract containing Davis-Bacon provisions must be referred to the Secretary for determination."). As the Windsor court concluded, "a Davis-Bacon Act worker classification dispute, by itself, is not an FCA claim because such disputes must be resolved by the Department of Labor." 895 F. Supp. at 851. Therefore, referral of relators' misclassification claims to the Department of Labor is appropriate in this case.

Additionally, the court has considered a four-factor test employed by a number of courts to determine whether agency referral is appropriate. Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., 46 F.3d 220, 223 (2d Cir. 1995); see also Moore, 2014 WL 4802039, Civil Action No. 1:12CV123, at *17 (N.D.W. Va. Sept. 23, 2014). The four factors include:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the

22

agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

Id. After consideration of these factors, a court "must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." Id.

The court finds that the four-factor test weighs in favor of referral to the Department of Labor. The consideration of appropriate labor classifications does not fall within the typical purview or conventional experience of judges. Consideration of this issue is suited particularly for the Department of Labor, as the agency itself creates the classifications. Further, "the structure of the Davis-Bacon Act and its implementing regulations suggests that the principal avenue of enforcement under the statutory scheme is administrative." Krol, 2014 WL 4548610, No. 13-cv-449 (RJS), at *7 (S.D.N.Y. Sept. 11, 2014). The court additionally finds that a failure to refer the misclassification issue to the Department of Labor would raise a considerable risk of inconsistent rulings. And, finally, the court notes that relators have yet to file a claim with the Department of Labor regarding the alleged misclassification. While referral to an administrative

23

agency almost certainly will lengthen the judicial process, the court notes that the advantages of referral outweigh any potential delays because both parties will have the benefit of the agency's special expertise on this issue.  Consequently, the court finds that these factors weigh in favor of referring relators' misclassification claims to the Department of Labor.

### 3. The Court's Option to Stay a Case Referred to an Administrative Agency

After a court has determined that an agency should exercise primary jurisdiction over a claim, the court must determine further whether to stay the proceedings or dismiss the claim without prejudice.  See Reiter v. Cooper, 507 U.S. 258, 268–69 (1993).  A court may stay proceedings, but also has the option to dismiss a claim without prejudice if the parties would not be "unfairly disadvantaged" by such a dismissal.  Id.; see also In re Bulldog Trucking, 66 F.3d at 1399–1400.

The court finds that relators would be unfairly disadvantaged if the court dismissed their misclassification claim without prejudice instead of staying the case.  A plaintiff seeking relief under the False Claims Act must file his or her claim fewer than six years after the alleged violation took place.  31 U.S.C. § 3731(b)(1) (2012).  Relators' claims for misclassification date back to August 2007.  (Doc. No. 34 at ¶¶ 65, 68).  If the court dismissed their

24

misclassification claim, the statute of limitations would prevent relators from re-filing.  Consequently, the court elects to stay the action pending the Department of Labor's determination regarding relators' misclassification claim.

### 4. Relators' Unpaid Overtime Claim

Relators further allege that defendant Elliott violated the Davis-Bacon Act by requiring certain employees to work overtime without pay.  The court finds that the amended complaint fails to allege this fraudulent conduct with necessary particularity.

Relators' amended complaint contains scant information regarding their unpaid overtime claim.  The amended complaint contains no information regarding which Elliott supervisor told relators and/or other employees that overtime was a condition of work on the FCI McDowell job, nor does it give even estimated dates for when relators worked overtime at an Elliott supervisor's residence.  Furthermore, none of relators' allegations regarding overtime tie Clark to any wrongdoing.  For these reasons, the court finds that relators' claim related to unpaid overtime fails Rule 9(b)'s particularity requirements and is dismissed.

### D. False Presentation Resulting from Violations of the Copeland and Davis-Bacon Acts

Finally, relators allege that defendant Elliot extorted kickbacks from undocumented workers in exchange for jobs as

Project Workers on the FCI McDowell project.  Relators contend
that Clark knew of these kickbacks and that both companies
falsely certified their weekly payroll reports, thereby
violating the False Claims Act when they presented to the
Government these claims for payment.

The FCI McDowell construction contract required compliance
with both the Copeland Act and the Davis-Bacon Act.  The
Copeland Act imposes criminal liability on any person who:

> by force, intimidation, or threat of procuring
> dismissal from employment, or by any other manner
> whatsoever induces any person employed in the
> construction . . . of any public building . . . or
> work financed in whole or in part by . . . the United
> States, to give up any part of the compensation to
> which he is entitled under his contract of employment.

18 U.S.C. § 874 (2012).  Under the Davis-Bacon Act, contractors
and subcontractors must pay workers the prevailing wage for his
or her craft without any unauthorized deductions.  18 U.S.C. §
3141, et seq. (2012).

As described above, false certification arises where (1) "a
Government contract or program required compliance with certain
conditions as a prerequisite to a Government benefit, payment or
program;" (2) "the defendant failed to comply with those
conditions;" and (3) "the defendant falsely certified that it
had complied with the conditions in order to induce the
Government benefit."  United States ex rel. Godfrey v. KBR,
Inc., 360 F. App'x 407, 411-12 (4th Cir. 2010).  And, again, the

heightened pleading standard for fraud under Rule 9(b) applies
to such claims.  Harrison, 176 F.3d at 784.

### 1. Rule 9(b) and Presentment of False Claims

A relator who makes claims under Rule 9(b) must include in
his or her complaint "the time, place, and contents of the false
representations, as well as the identity of the person making
the misrepresentation and what he obtained thereby."  United
States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d
370, 379 (4th Cir. 2008) (citation and internal quotation marks
omitted).  Moreover, the Fourth Circuit requires a claimant to
plead more than the existence of a fraudulent scheme that
supports an inference that false claims were presented to the
Government.  Nathan, 707 F.3d at 456.  Instead, relators must
allege with some indicia of reliability that an actual false
claim was submitted to the Government.  Id. at 456-57.  If a
relator fails to include such allegations of presentment, "a
relator not only fails to meet the particularity requirement of
Rule 9(b), but also does not satisfy the general plausibility
standard of Iqbal."  Id. at 457.

The Fourth Circuit has acknowledged that many relators face
practical challenges to meet the heightened Rule 9(b) standard
when alleging false presentment, as most do not have independent
access to records demonstrating false claims.  Id. at 458.
Nevertheless, the pleading requirements "do not permit a relator

27

to bring an action without pleading facts that support all the elements of a claim." Id. (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002) (noting "the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of the claim")). The particularity requirement of Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail, but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." Id. at 456–57 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002)).

In this case, relators' amended complaint does not satisfy Rule 9(b) because it fails to plead presentment with the necessary particularity. The amended complaint describes certain elements of the alleged kickback scheme with considerable particularity. Relators go into great detail in their allegations of a kickback scheme, including who allegedly solicited undocumented workers and the required payments, but fail to plead any evidence demonstrating that defendants actually presented a claim for payment. See United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358–59 (11th Cir. 2006) ("[Relator] fails to provide the next link in the FCA liability

28

chain:  showing that the defendants <u>actually</u> <u>submitted</u>
reimbursement claims for the services he describes.  Instead, he
portrays the scheme and then summarily concludes that the Named
Defendants submitted false claims to the Government for
reimbursement." (emphasis in original)).

Relators' amended complaint presumes that defendants did
indeed present a claim to the Government for payment because
they should have or must have presented a claim.  However,
relators provide no information regarding "details concerning
the dates of the claims, the content of the forms or bills
submitted, their identification numbers, the amount of money
charged to the Government, the particular goods or services for
which the Government was billed, the individuals involved in the
billing."  <u>United States ex rel. Karvelas v. Melrose-Wakefield</u>
<u>Hosp.</u>, 360 F.3d 220, 232 (1st Cir. 2004); <u>see also</u> <u>Clausen</u>, 290
F.3d at 1320 (requiring specific contents of actually submitted
claims, such as billing numbers, dates, and amounts to satisfy
Rule 9(b)'s particularity standard).  Relators allege that
defendants violated the False Claims Act, yet plead no
information detailing a <u>claim</u> made to the Government.  As a
result, the amended complaint does not meet the stringent
particularity standard of Rule 9(b).

Notably, the amended complaint itself demonstrates
relators' cognizance of the detailed requirements for pleading

presentment under Rule 9(b). To support their argument that defendants paid relators insufficient wages, the amended complaint includes considerable documentation regarding their allegation. For each pay period, the amended complaint lists each relator's check number, dates worked, hours paid, rate of pay, and gross pay. (Doc. No. 34 at ¶¶ 57, 65, and 68). However, for their claim regarding violations of the Copeland and Davis-Bacon Acts, the amended complaint fails to provide any documentation at all, let alone the documentation proffered for their misclassification claim. Consequently, relators' claim regarding alleged violations of the Copeland and Davis-Bacon Acts is dismissed.

### 2. Rule 9(b) Particularity and the Kickback Scheme

Furthermore, even if relators' amended complaint pled presentment with the necessary particularity, the court nevertheless would dismiss relators' claim for failure to plead the kickback scheme with necessary particularity. In order to allege a kickback scheme, relators must plead information related to both sides of the equation: extorters and victims. Relators contend that the kickback scheme created a false representation--that Clark and Elliott falsely certified that they had not induced any worker to give up part of his entitled compensation when the companies presented demands for payment to the Government. Absent information regarding these workers'

identities, relators fail to satisfy Rule 9(b) because they neglect to describe the contents of defendants' false representations.

The amended complaint alleges that Elliot extorted kickbacks from undocumented workers "who were citizens of Mexico and countries in Central America," but provides little further information. Relators contend that these workers included two "who went by the names of Ricardo and Maynor." But this is all of the information that relators provide about the alleged victims. Relators would have to rely on discovery to obtain information concerning their claim, and, as described above, this is precisely what Rule 9(b) seeks to prevent. Accordingly, relators' claim related to violations of the Copeland and Davis-Bacon Acts is dismissed.

### E. Employment of Undocumented Workers in Violation of 8 U.S.C. § 1324(a)(3)(A) and Executive Order 12,989

In the amended complaint, relators claim that Elliott and Clark violated 8 U.S.C. § 1324(a)(3)(A) and Executive Order 12,989 when Elliott employed undocumented workers on the FCI McDowell project. (Doc. No. 34 at ¶ 36). However, as defendants point out, neither the statute nor the Executive Order creates a private right of action. See Flores v. George Braun Packing Co., 482 F.2d 279, 280 (5th Cir. 1973) (per curiam); see also Parkell v. S.C., 687 F. Supp. 2d 576, 589-90

31

(D.S.C. 2009); Exec. Order No. 13,286, 68 Fed. Reg. 10619 (Mar. 5, 2003) (amending Executive Order 12,989 to reflect that the Secretary of Homeland Security, rather than the Attorney General, is responsible for investigating a contractor's compliance with the INA's employment provisions).  Notably, relators did not address this argument in their response to defendants' motions to dismiss.  Accordingly, relators' claim that defendants violated 8 U.S.C. § 1324(a)(3)(A) and Executive Order 12,989 is dismissed.

**F. Conspiracy Claim**

Near the end of their amended complaint, relators include a claim that defendants conspired to defraud the Government. (Doc. No. 34 at ¶¶ 101-01).  To plead a conspiracy under the False Claims Act, a relator "must allege with particularity facts (1) to support the formation of an unlawful agreement between the conspirators to get a false claim paid, and (2) at least one overt act in furtherance of the conspiracy." United States ex rel. Godfrey v. KBR, Inc., 360 F. App'x 407, 413 (4th Cir. 2010).  Further, a relator "must show that the conspirators agreed to make use of the false record or statement to achieve this end." United States ex rel. DeCesare v. Americare In Home Nursing, 757 F. Supp. 2d 573, 584 (E.D. Va. 2010).  Finally, a conspiracy claim predicated on claims of underlying FCA

violations "rises and falls with the individual claims."
<u>Godfrey</u>, 360 F. App'x at 413.

In their amended complaint, relators fail to plead with particularity facts that support an unlawful agreement between Clark and Elliot to submit false claims for payment. Relators fail to plead any facts that relate at all to an unlawful agreement between defendants. Relators allege that the two companies knew of the other's FCA violations, but fail to plead the defendants agreed to make use of a false record or statement to induce the Government to pay a claim. Accordingly, the court dismisses relators' claim related to conspiracy under the False Claims Act.

### V.   Leave to Amend the Amended Complaint

In their memorandum in opposition to defendants' motions to dismiss, relators request leave to amend their amended complaint. (Doc. No. 45 at 34). The court denies without prejudice leave to amend the amended complaint at this juncture. However, plaintiffs may file a motion to amend their amended complaint along with a proposed amended complaint, at which time the court will consider their motion.

### VI.  Conclusion

For the reasons cited herein, the court **GRANTS** in part and **DENIES** in part defendants' motions to dismiss. (Doc. Nos. 38, 42). The case is **STAYED** pending the Department of Labor's

resolution of relators' labor misclassification claims.  The
Clerk is **DIRECTED** to remove this case from the active docket of
the court until further notice.

Furthermore, defendants' motions to dismiss relators'
original complaint are hereby **DENIED** as moot, as well as related
motions to extend briefing deadlines and exceed Rule 7.1 page
limitations.  (Doc. Nos. 27, 31, 41).

The Clerk is directed to send copies of this Memorandum
Opinion and Order to counsel of record.

IT IS SO ORDERED this 11th day of March, 2015.

ENTER:

David A. Faber
Senior United States District Judge